**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CARLOS GHOSN AND GREGORY L. KELLY,**<br><br>**Defendants.** | **COMPLAINT**<br>**[Securities Fraud]**<br><br>**1:19-CV-08798 (      )**<br><br>**ECF CASE** |

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), alleges as follows against Defendants Carlos Ghosn and Gregory L. Kelly:

<u>**SUMMARY**</u>

1.      From 2001 through 2018, Carlos Ghosn served as Chairman of the Board of Directors and/or Chief Executive Officer (CEO) of Nissan Motor Co., Ltd. ("Nissan").

2.      Nissan is a Japanese automobile manufacturer with securities that trade on the Tokyo Stock Exchange.  Nissan's sponsored American Depositary Receipts ("ADRs") trade in the United States in the over-the-counter ("OTC") market and through brokerage firms.  Nissan's ADRs are exempt from registration in the United States, in part, because Nissan publishes English versions of its Japanese securities filings for review by investors trading in the United States.

3.      From fiscal year 2004 through 2018, Nissan's Board of Directors delegated to Ghosn the authority to set individual director and executive compensation, including his own compensation, within certain aggregate limits.  Although the delegation in certain years contemplated that Ghosn would consult with certain other directors about compensation decisions, in practice, Ghosn set the amount of his compensation without oversight.

4.      Kelly was a long-serving human resources executive with Nissan who Ghosn appointed to the Board of Directors in June 2012 as a "representative director," a position Kelly held

through November 2018.  Kelly was one of Ghosn's trusted subordinates and worked with two other

senior Nissan employees in connection with certain of the conduct described herein.

5.     In or around March 2010, Japan's Financial Services Agency ("JFSA") amended its

disclosure rules to require publicly-traded companies such as Nissan to disclose the total

compensation of each individual officer and director whose total compensation equals or exceeds

100 million Japanese yen (¥), roughly equal to $1 million in U.S. dollars at the time of the

amendment.  These new rules were first applicable to Nissan's disclosures for fiscal year 2009,

which ended March 31, 2010, and individual director compensation was first included in the

annual report for fiscal year 2009 that Nissan filed in or around June 2010 and made available in

English on its website at the same time.

6.     Beginning in fiscal year 2009 and continuing until fiscal year 2018, Ghosn, with

substantial assistance from his Nissan subordinates, took part in a scheme to conceal from public

disclosure more than $90 million in compensation to be paid to Ghosn.  Although this undisclosed

compensation was in fact not paid to Ghosn, his total compensation was fixed and certain in each

fiscal year, with a paid portion that was disclosed by Nissan and a significant portion that was unpaid

and undisclosed.  According to records maintained by Nissan's Secretariat's Office, Ghosn's

remuneration from fiscal year 2009 through fiscal year 2017 was approximately:

| Fiscal Year | Total Fixed Compensation (JPY / USD)[1] | Paid Compensation (JPY / USD) | Undisclosed Compensation (JPY / USD) |
|:---:|:---:|:---:|:---:|
| 2009 | ¥1,437M / $15M | ¥1,211M / $13M | ¥226M / $2M |
| 2010 | ¥1,782M / $21M | ¥982M / $11M | ¥800M / $9M |
| 2011 | ¥1,894M / $24M | ¥987M / $12M | ¥907M / $11M |
| 2012 | ¥1,984M / $24M | ¥949M / $11M | ¥1,035M / $12M |
| 2013 | ¥2,048M / $20M | ¥958M / $10M | ¥1,090M / $11M |

---

[1] Amounts are rounded and U.S. dollar conversions are based on average JPY/USD exchange
rate for the fiscal year.

| 2014 | ¥2,131M / $19M | ¥1,035M / $9M | ¥1,096M / $10M |
|---|---|---|---|
| 2015 | ¥2,228M / $19M | ¥1,071M / $9M | ¥1,157M / $10M |
| 2016 | ¥2,392M / $22M | ¥1,098M / $10M | ¥1,293M / $12M |
| 2017 | ¥2,422M / $22M | ¥735M / $7M | ¥1,688M / $15M |
| Total | ¥18,318M / $186M | ¥9,026M / $91M | ¥9,292M / $94M |

7.      Ghosn, with substantial assistance from his subordinates, including Kelly, considered multiple ways to pay the undisclosed portion of his compensation through Nissan-related entities without public disclosure.  Ghosn and his subordinates abandoned those plans when disclosure appeared unavoidable, and instead crafted different ways to structure payment after Ghosn's retirement without disclosure in the periods when the compensation had been earned and fixed.

8.      Among other schemes, Ghosn entered into secret contracts countersigned by a senior employee who worked directly for Ghosn in Nissan's Secretariat's Office, and executed backdated letters granting himself cash awards under Nissan's annual Long Term Incentive Plan ("LTIP") in the amount of his undisclosed compensation.

9.      In addition to the more than $90 million in undisclosed and unpaid compensation, Ghosn and his subordinates knowingly or recklessly made, or caused to be made, false and misleading statements regarding more than $50 million of additional pension benefits for Ghosn.  These included misleading Nissan's CFO and other Nissan executives regarding the accounting for the additional pension amounts, and creating a false disclosure to support how Nissan accounted for them.

10.      These actions caused Nissan's failure to disclose the full amount of Ghosn's compensation in certain annual reports that were certified by Ghosn and filed with Japanese regulators.  These misrepresentations and omissions violated Japanese disclosure requirements, and they were published in English on Nissan's website for U.S. investors.

11.     Through the conduct alleged herein, Ghosn violated Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and SEC Rule 10b-5 [17 C.F.R. §

240.10b-5], and also aided and abetted Nissan's violations of Section 10(b) and SEC Rule 10b-5.

Kelly aided and abetted Ghosn's and Nissan's violations of the same.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter pursuant to Sections 21 and 27 of the

Exchange Act [15 U.S.C. §§ 78u and 78aa].

13.     Defendants, directly or indirectly, made use of the means or instrumentalities of

interstate commerce or the mails, or a facility of a national securities exchange, in connection

with the purchase or sale of securities, as alleged herein.

14.     Venue is proper because, among other things, one or more purchasers of Nissan's

securities reside in this District and/or purchased Nissan securities in this District.

## DEFENDANTS

15.     Carlos Ghosn, age 65, is a Brazilian-born businessman who also has French and

Lebanese citizenship.  Ghosn is an engineer with degrees from the École Polytechnique (1974)

and the École des Mines de Paris (1978).  Ghosn began his career with Michelin in 1978 and

became an executive vice president at Groupe Renault SA in 1996.  In June 1999, Ghosn took on

the role of Nissan's Chief Operating Officer (COO) after Renault and Nissan formed an alliance

that year.  He became Nissan's President in 2000, its Chief Executive Officer (CEO) in 2001,

and its Chairman, President, and CEO in 2008.  In 2009, Ghosn was elevated to Chairman and

CEO of Renault, and he became Chairman of Mitsubishi Motors in 2016 after Nissan acquired a

controlling stake in the company.

16.     Gregory L. Kelly, age 62, is a resident of Brentwood, Tennessee and a graduate of

Augustana College (1978) and Loyola University School of Law (1981).  Kelly joined Nissan North

America in 1988 as Senior Manager and Associate Legal Counsel, became Nissan's Director of

Human Resources in 1993, Senior Director of Human Resources in 2000, and a Nissan Senior Vice

President in 2008.  Ghosn appointed Kelly to Nissan's Board of Directors in June 2012 as a

"representative director," a position he held through November 2018, after which he continued as a

director of Nissan until April 2019.  From September 2008 to April 2014, Kelly oversaw Nissan's

CEO's Office, Legal Department, and Internal Audit Department.

## FACTS

### I.   NISSAN'S DIRECTOR COMPENSATION DISCLOSURE OBLIGATIONS

17.     Nissan is a Japanese automobile manufacturer with securities that trade on the

Tokyo Stock Exchange and sponsored ADRs that trade in the United States in the OTC market

and through brokerage firms.  ADRs are negotiable certificates issued by a U.S. depository bank

that represent an investment in a specified number of shares, or as little as one share, of a foreign

company's stock.

18.     SEC Rule 12g3-2 under the Exchange Act, (17 CFR § 240.12g3-2), exempts

companies like Nissan from having to register their equity securities with the SEC if they make

translated English language copies of their foreign securities filings available on the internet for the

benefit of U.S. investors, and allows such companies to have their equity securities trade as ADRs in

the OTC market without registration.

19.     Under SEC Rule 12g3-2, Nissan must publish in English on its Internet website, or

through an electronic information delivery system generally available to the public in its primary

trading market, information that, since the first day of its most recently completed fiscal year, the

company (a) has made public or been required to make public pursuant to its home country's

laws, (b) has filed or been required to file with the principal stock exchange in its primary trading

market on which its securities are traded and which has been made public by that exchange, and (c) has distributed or been required to distribute to its security holders.

20.    SEC Rule 12g3-2 requires such English translations to include information that is material to an investment decision regarding the company's securities including, specifically, the granting of options or the payment of other remuneration to directors or officers, and transactions with directors, officers, or principal security holders, if and as required to be disclosed by the company's domestic disclosure laws or regulations.

21.    Companies like Nissan also must electronically publish English translations of (a) their annual report, including or accompanied by annual financial statements; (b) interim reports that include financial statements; (c) press releases; and (d) all other communications and documents distributed directly to security holders of each class of securities that are exempt from registration with the SEC.

22.    At all times relevant to this matter, Nissan published on its Internet website the English translations of its annual and interim reports and financial statements, press releases, and communications provided directly to its security holders.  These English translations included information that is material to an investment decision regarding its securities, including, particularly, the granting of options or the payment of other remuneration to Nissan's directors or officers and transactions with Nissan's directors, officers or principal security holders.

23.    Among the documents translated into English pursuant to Rule 12g3-2 was Nissan's "Yukashoken-Hokokusho," an annual report filed in accordance with Japan's securities regulations (hereinafter, "Nissan's annual report").  The Corporate Governance portion of that report included Nissan's director compensation disclosure.

24.     Like many Japanese companies, Nissan's fiscal year ran from April 1 to March 31 – for example, fiscal year 2009 ran from April 1, 2009 through March 31, 2010 – and its annual reports were filed in June after the close of the fiscal year.

25.     In June 2009, the JFSA issued a report, "Financial System Council's Study Group on the Internationalization of Japanese Financial and Capital Markets: Toward Stronger Corporate Governance of Publicly Listed Companies," (http://www.fsa.go.jp/singi/singi_kinyu/tosin/20090617.html (Japanese only)), that stated the importance of executive compensation to shareholders and investors:

> Executive compensation is regarded as one of the important pieces of information for shareholders and investors from the perspective of management incentive structures.  Furthermore, it has been said that excessive remuneration and stock options provide incentives to the management to focus too much on the short-term, and in this regard it is important to strengthen the accountability regarding how executive compensation is determined.  Therefore, companies should disclose their existing executive remuneration policies, and also improve disclosures of pay, with a breakdown according to the type of incentives provided to executives, including stock options.

26.     Prior to March 31, 2010, Japanese disclosure rules required publicly-traded Japanese companies to disclose in their annual reports the compensation paid to their directors in the aggregate, rather than on an individual basis.

27.     The JFSA passed an amended disclosure rule in fiscal year 2009 that required disclosure of the total compensation awarded to each individual officer or director whose total compensation equaled or exceeded ¥100 million.  *See Cabinet Office Ordinance on Partial Amendment of Cabinet Office Ordinance on Disclosure of Corporate Information, etc. (2010 Cabinet Ordinance No. 12)*.  Under the new rule, the compensation required to be disclosed in a given fiscal year included salary, bonuses, stock options, severance payments, and "other" compensation paid during the fiscal year or where an estimate of the amount to be paid became

certain during that fiscal year.  This change impacted Nissan's Japanese securities filings beginning with fiscal year 2009, which ended on March 31, 2010.

28.    All aspects of Nissan's director compensation determinations, record-keeping, reporting, and payment were confidentially managed by the Secretariat's Office.  Nissan's Finance Department relied on those offices for the information needed to make Nissan's annual director compensation disclosures.

29.    Beginning with fiscal year 2009, Nissan's publicly-filed annual reports and the English translations published on Nissan's website included disclosures about Ghosn's compensation and stock option awards.  The filings through fiscal year 2015 were reviewed, approved, and signed by Ghosn as Nissan's CEO.

## II.    BETWEEN 2009 AND 2018, GHOSN EARNED ROUGHLY $94 MILLION OF UNDISCLOSED COMPENSATION

30.    Beginning in fiscal year 2004, Nissan's shareholders voted to establish an aggregate maximum amount of compensation to be divided amongst its directors, and delegated exclusive authority to set the compensation for each director to Ghosn as Nissan's Chairman and CEO.

31.    Although the Board's delegation in certain years contemplated that he would consult with Nissan's representative directors on the compensation decisions, in practice Ghosn set the amount of director and officer compensation without oversight.

32.    Prior to fiscal year 2009 and the change in Japanese rules requiring disclosure of individual director compensation above ¥100 million, Ghosn received payment on the full amount of compensation that he awarded himself each year.

33.    After the impending change to Japan's disclosure rules was announced, Ghosn became concerned about criticism that might result in the Japanese and French media if his total compensation became publicly known.

34.    As a result, Ghosn directed a senior Nissan executive to lobby the JFSA to rescind or postpone application of the 2009 changes to the JFSA's new disclosure rules.

35.    When Nissan's lobbying efforts failed, and to avoid public criticism, Ghosn and his Nissan subordinates took steps to conceal from public disclosure a substantial portion of Ghosn's compensation.  Beginning with fiscal year 2009 following the disclosure rules change, and continuing until his arrest by Japanese authorities in 2018, Ghosn, with the assistance of his Nissan subordinates, executed a scheme whereby more than 50% of Ghosn's compensation would be postponed and not reported in the annual report Nissan filed with the JFSA and published in English on its website.

36.    Each year beginning in 2011, a senior employee in Nissan's Secretariat's Office ("Nissan Employee 1") would prepare for Ghosn's approval a document summarizing Ghosn's total fixed compensation, his paid compensation that was being disclosed, and his remaining compensation that was not paid and was not being disclosed.

37.    According to reports prepared by Nissan Employee 1, Ghosn fixed his total compensation at ¥1.437 billion for fiscal year 2009, with ¥1.21 billion actually paid to Ghosn (Ghosn repaid ¥320 million of this amount in fiscal year 2009 with the expectation that it would be repaid to him in the future), and another ¥226 million to be paid in the future.

38.    Nissan's annual report for fiscal year 2009 listed Ghosn's total compensation at ¥891 million.  Neither Nissan nor Ghosn reported or disclosed the additional ¥546 million of compensation for that year.

39.    In late 2010 and early 2011, Ghosn fixed his total compensation at ¥1.782 billion for fiscal year 2010, of which ¥982 million was actually paid with ¥800 million remaining to be paid.

40.   Nissan's annual report for fiscal year 2010 listed Ghosn's total compensation as ¥982 million.  Neither Nissan nor Ghosn reported or disclosed the ¥800 million of postponed compensation for that fiscal year.

41.   For fiscal years 2009-2012, Kelly reviewed Nissan's annual reports. In each of those years, Kelly indicated his support in an online "decision form" that requested approval for filing the annual report.  For fiscal years 2009-2015, Ghosn provided the final "approval" for the filing on the same online decision form.

### III.   BEGINNING IN 2010, GHOSN SOUGHT WAYS TO BE PAID A PORTION OF HIS NISSAN COMPENSATION WITHOUT PUBLIC DISCLOSURE

42.   Beginning in early 2010, Ghosn and his subordinates sought multiple ways to pay his undisclosed compensation through Nissan-related entities without disclosure.  Initially, Ghosn's subordinates suggested making payments through Renault-Nissan, B.V. ("RNBV"), a joint venture between Renault and Nissan, without disclosure in Japan or to Renault's Board of Directors.  When further review raised concerns over potential disclosure requirements in France, this plan was abandoned.

43.   Ghosn and his subordinates next explored paying his undisclosed compensation through an "unconsolidated" Nissan subsidiary, meaning a subsidiary whose finances did not consolidate with Nissan's books and records for reporting purposes.  In October 2010, Kelly presented Nissan's Executive Committee with a proposal for a new unconsolidated subsidiary "to analyze business opportunities such as potential joint ventures and investments in promising technologies."  Nissan's Executive Committee approved the proposal and Ghosn's subordinates proceeded to set up new legal entities named Zi-A Capital B.V. (Netherlands) and Zi-A Capital Ltd. (Dubai), which Nissan initially funded with approximately $60 million (USD).

44.   Through the end of fiscal year 2010, Nissan Employee 1 made preparations to pay Ghosn's postponed compensation through Zi-A Capital Ltd.  However, in March 2011, Ghosn

10

told him they would not to proceed with the payment through the Zi-A entities.  In the end, the Zi-A entities never invested in any technologies, business opportunities, or joint ventures as originally proposed to Nissan's Executive Committee.

45.     In April 2011, Ghosn and certain Nissan subordinates considered the possibility of paying his undisclosed compensation through post-retirement consulting fees.

46.     In April 2011, Ghosn and Nissan Employee 1 signed a letter agreement memorializing a plan to pay and postpone portions of Ghosn's fiscal years 2009 and 2010 compensation (the "2011 Letter Agreement").  The letter agreement was backdated to March 24, 2011, so that it predated the end of Nissan's 2010 fiscal year.

47.     The 2011 Letter Agreement stated that "the remuneration amount of each fiscal year has been determined and paid," and "[p]ayment of a part of the determined remuneration of [fiscal year] 2009 and [fiscal year] 2010 has been postponed."

48.     The letter agreement included a chart that stated Ghosn's "Fixed Remuneration" for fiscal years 2009 and 2010, as well as the "Paid Remuneration" and "Postponed Remuneration" portions of his compensation. These values tied directly to the amounts maintained in Secretariat's Office records by Nissan Employee 1:

|  | Fixed Remuneration | Paid Remuneration | Postponed Remuneration |
|---|---|---|---|
| **FY2009** | ¥1,437,224,708 | ¥1,211,425,848 | ¥225,798,860 |
| **FY2010** | ¥1,781,890,913 | ¥981,770,724 | ¥800,120,189 |
| **TOTAL** | ¥3,219,115,621 | ¥2,193,196,572 | ¥1,025,919,049 |

49.     The 2011 Letter Agreement set a U.S. dollar value for Ghosn's total postponed remuneration for the two years – "(1,025,919,049 JPY / 12,668,795 USD)" – and included language allowing Ghosn to decide at the time of payment whether to be paid in yen or dollars: "[it] will be paid to Mr. Ghosn in the requested currency (JPY or USD)."  Prior to this letter

agreement, Ghosn did not get to choose the currency in which he would be paid, giving him a new benefit that could prove significant if exchange rates were to change before he received payment.

50.    The 2011 letter agreement stated that Ghosn would be paid the postponed compensation in the first year following his retirement from the Board, and that he would be appointed an Executive Consultant or Executive Advisor for two years following his retirement.

51.    The letter agreement also stated that Ghosn could choose to have his retirement allowance paid in yen or dollars, a new benefit that was not included in his original 2007 award.

52.    For fiscal years 2011 and 2012, Ghosn and Nissan Employee 1 engaged in the same practices and record-keeping to set Ghosn's total compensation while reporting in Nissan's annual reports only the portion that was actually paid to Ghosn.

53.    For fiscal year 2011, Ghosn fixed his total compensation at roughly ¥1.89 billion, of which ¥987 million was actually paid and roughly ¥907 million remained to be paid.  Nissan's annual report for fiscal year 2011 listed Ghosn's total compensation at ¥987 million.

54.    For fiscal year 2012, Ghosn fixed his total compensation at roughly ¥1.98 billion, of which ¥950 million was actually paid and ¥1.03 billion remained to be paid.  Nissan's annual report for fiscal year 2012 listed Ghosn's total compensation at ¥988 million.

55.    Neither Nissan nor Ghosn reported or disclosed his postponed compensation for fiscal years 2011 and 2012.

56.    In April 2013, Ghosn and Nissan Employee 1 signed another letter agreement memorializing the paid and postponed portions of Ghosn's fiscal year 2011 and 2012 compensation (the "2013 Letter Agreement").

57.    As with the 2011 Letter Agreement, the 2013 Letter Agreement stated that "the remuneration amount of each fiscal year has been determined and paid," and "[p]ayment of a part of the determined remuneration of [fiscal year] 2011 and [fiscal year] 2012 has been postponed."

58.   The 2013 Letter Agreement included a chart that displayed Ghosn's "Fixed Remuneration" for fiscal years 2011 and 2012, broke out the "Paid Remuneration" and "Postponed Remuneration" portions, and included an "Exchange rate" column:

|  | Fixed Remuneration | Paid Remuneration | Postponed Remuneration | Exchange rate (at the end of FY) |
|---|---|---|---|---|
| FY2011 | ¥1,893,909,365 | ¥987,110,678 | ¥906,798,687 | ¥82.19/$ |
| FY2012 | ¥1,983,891,541 | ¥949,365,093 | ¥1,034,526,448 | ¥93.99/$ |
| TOTAL | ¥3,877,800,906 | ¥1,936,475,771 | ¥1,941,325,135 | |

59.   The 2013 Letter Agreement stated, "[a]s at the end of March 2013, the total amount to be paid to Mr. Ghosn as the postponed remuneration of FY2011 and FY212 *[sic]* is 1,941,325,135 JPY.  It will be 22,039,727.85 USD that is converted with the exchange rate (TTM on Tokyo Stock Exchange Market) as of the end of each fiscal year."

60.   The 2013 Letter Agreement also included language protecting Ghosn against future currency price fluctuations: "the postponed amount will be paid to Mr. Ghosn in the requested currency (JPY or USD)."

61.   For fiscal years 2013 through 2017, Ghosn and Nissan Employee 1 engaged in practices and record-keeping to set Ghosn's total compensation while reporting in Nissan's annual reports only the portion that was actually paid to Ghosn:

|  | Fixed Remuneration | Paid Remuneration | Postponed Remuneration | Nissan's Annual Report |
|---|---|---|---|---|
| FY2013 | ¥2,048,125,394 | ¥958,249,657 | ¥1,089,875,737 | ¥995,000,000 |
| FY2014 | ¥2,130,788,423 | ¥1,034,756,477 | ¥1,096,031,946 | ¥1,035,000,000 |
| FY2015 | ¥2,227,994,278 | ¥1,071,219,433 | ¥1,156, 774,845 | ¥1,071,000,000 |
| FY2016 | ¥2,391,624,070 | ¥1,098,234,438 | ¥1,293,389,632 | ¥1,098,000,000 |
| FY2017 | ¥2,422,466,738 | ¥734,596,029 | ¥1,687,870,709 | ¥735,000,000 |

62.   Neither Nissan nor Ghosn reported or disclosed Ghosn's postponed compensation for fiscal years 2013 through 2017.

63.    According to spreadsheets prepared and maintained by Nissan Employee 1, Ghosn fixed his total compensation at ¥18.3 billion for fiscal years 2009 through 2017, during which time he received cash compensation of roughly ¥9.0 billion.  Ghosn's total postponed and undisclosed compensation during this period was roughly ¥9.3 billion, which had a U.S. dollar value of more than $94 million based on exchange rates recorded by Nissan Employee 1.

64.    Nissan Employee 1 showed or provided to Ghosn the reports he prepared each fiscal year to set Ghosn's total, paid, and postponed compensation, as well as the spreadsheets he maintained and updated each year that tracked the same information.

65.    Kelly knowingly or recklessly provided substantial assistance to Ghosn's efforts to receive more than $90 million of undisclosed compensation, including by discussing the aforementioned plans with Ghosn and his other Nissan subordinates, reviewing and editing certain of the documents that were intended to effect the different schemes, including backdated letters and Nissan annual reports, and directing other Nissan employees in furtherance of the schemes.

### IV.    GHOSN USED BACKDATED LTIP AWARD LETTERS IN AN EFFORT TO SECURE PAYMENT OF A PORTION OF HIS UNDISCLOSED COMPENSATION

67.    In the autumn of 2013, Ghosn and his Nissan subordinates used backdated letters in an effort to secure payment of a portion of his undisclosed compensation through interests in Nissan's Long Term Incentive Plan ("LTIP").  Ghosn had not previously participated in Nissan's LTIP program.

68.    To implement this new scheme, Nissan Employee 1 prepared four backdated LTIP award letters for fiscal years 2009-2012, granting Ghosn an LTIP interest in the amount of his previously undisclosed compensation for each of those years.

69.    The backdated LTIP award letters included a U.S. dollar value for each LTIP award using an annual average exchange rate from the respective fiscal year, and allowed Ghosn to decide whether to be paid in Japanese yen or U.S. dollars after his retirement in 2017.

70.    The backdated LTIP award letters were intended to ensure Ghosn would receive payment on the postponed compensation that had been omitted from Nissan's director compensation disclosures.

71.    In fiscal year 2014, Ghosn directed Nissan Employee 1 to have the finance department book approximately $80 million into Nissan's LTIP reserve to cover $58 million in LTIP awards for Ghosn for fiscal years 2009 through 2014, as well as approximately $22 million for exchange rate fluctuations on Ghosn's retirement allowance, described below.

72.    At Ghosn's direction, Nissan Employee 1 contacted a senior finance executive to discuss recording the LTIP, and was informed that, given the size of the booking, it would be best to use the CEO Reserve and for Ghosn to discuss the booking directly with Nissan's CFO.

73.    On or around February 23, 2015, at Ghosn's direction, Nissan Employee 1 submitted an "Application for Budget Usage" signed by Ghosn, Nissan Employee 1, and Nissan's CFO, to approve the use of the CEO reserve to book the LTIP awards.

74.    Nissan's CFO was falsely told that the LTIP awards were a broad-based grant to numerous Nissan participants rather than that the vast majority was for Ghosn and included exchange rate protection on the inflated retirement allowance.

75.    Relying on this false information, Nissan's CFO approved and signed off on the LTIP expense request, and the amounts were recorded over three fiscal years.  Nissan's CFO would not have approved booking the LTIP expense without additional disclosure if he had known the truth about its actual intended use.

76.     By 2017, Nissan Employee 1 became concerned that Japan's Revenue Tax Bureau might raise questions about the tax treatment of the LTIP award and require disclosure of the LTIP award recipients in the event of a tax audit, and he alerted Ghosn to this concern.  Fearing public disclosure of the LTIP award, Ghosn approved reversing the impact of the LTIP awards in Nissan's accounting system.

77.     Kelly knowingly or recklessly provided substantial assistance to Ghosn's efforts to pay his undisclosed compensation through an LTIP award that was never disclosed to investors, including by discussing the plan with Ghosn and his other Nissan subordinates, reviewing and editing backdated documents intended to effect the scheme, and directing other Nissan employees in furtherance of the scheme.

### V.     GHOSN INFLATED HIS RETIREMENT ALLOWANCE BY MORE THAN $50 MILLION, WHICH WAS FALSELY DISCLOSED IN NISSAN'S ANNUAL REPORT

79.     In or around June 2007, Nissan's shareholders voted to discontinue Nissan's pension program for directors and statutory auditors.  To implement the shareholder vote, Nissan determined the value of each director's retirement allowance at that point in time and included the aggregate amount in "Other Long-Term Liabilities" for the fiscal year ended March 31, 2008.

80.     On June 18, 2007, Nissan informed Ghosn by letter that he had been granted a retirement allowance of ¥4.4 billion.

81.     The June 2007 letter calculated Ghosn's estimated retirement allowance in Japanese yen using certain formulas and an average of his total base and variable compensation for fiscal years 2005 and 2006, without any provision for currency price fluctuations.

82.     In June 2007, the U.S. dollar was worth at or around about ¥123.6, making Ghosn's ¥4.4 billion retirement allowance worth approximately $36 million at that time.

83.    In April 2011, as discussed earlier, when Ghosn and Nissan Employee 1 executed the 2011 Letter Agreement memorializing Ghosn's postponed compensation, they included language that set a U.S. dollar value for Ghosn's retirement allowance and allowed Ghosn to choose the currency in which he would be paid:  "Regarding the retirement allowance (4,444,242,398 JPY / 54,880,741 USD), same as other retired Directors, it will be paid within 1 month after approved at Board of Directors.  The fixed amount of the retirement allowance will be paid to Mr. Ghosn in the requested currency (JPY or USD)."  The ability to choose in which currency to be paid was not included in Ghosn's original retirement allowance award, was not approved by Nissan's Board, and was not disclosed in Nissan's public filings.

84.    In or around July 2013, Ghosn asked his subordinates, including Kelly, to consider whether his retirement allowance had been miscalculated in 2007 and explore alternative ways to calculate it to make it a larger amount.

85.    As a result of those efforts, Ghosn approved an alternative calculation to his retirement allowance that increased it from approximately ¥4.4 billion to roughly ¥6.9 billion.

86.    Although Nissan Employee 1 initially prepared calculations that considered changing the formula for all directors and statutory auditors, Ghosn ultimately decided that they would only increase his retirement allowance.

87.    In subsequent email communications, another Nissan executive ("Nissan Employee 2") described the retirement allowance increase as a "contrived construction of the pension plan."

88.    In or around October 2013, after settling on the calculation, Ghosn and his subordinates sought to have the new pension amount recorded in Nissan's accounting records. Pursuant to those instructions, Nissan Employee 1 drafted a new retirement allowance award letter on Nissan letterhead that he backdated to September 1, 2007 and signed as general manager of Nissan's Secretariat's Office before providing it to Ghosn.

89.     The backdated retirement award letter used the same formulas as the original letter but added roughly ¥833.3 million to Ghosn's fiscal year 2005 compensation and ¥406.5 million to his fiscal year 2006 compensation, which resulted in Ghosn's retirement allowance increasing to roughly ¥6.9 billion.

90.     Nissan employee 1 prepared spreadsheets that showed the ¥4.4 billion "original amount" of Ghosn's retirement allowance, an "additional amount" of roughly ¥2.5 billion, and valued the roughly ¥6.9 billion total at $82,761,863.48 using an exchange rate of ¥82.91 per U.S. dollar.

91.     Ghosn's original ¥4.4 billion retirement allowance was worth roughly $53.6 million using the ¥82.91exchange rate reflected in this spreadsheet, making the increase to ¥6.9 billion worth an additional $29 million to Ghosn.

92.     On October 21, 2013, Nissan Employee 1 emailed Nissan Employee 2 about booking the increase to Ghosn's retirement allowance "without making it public."  Nissan Employee 1 wrote, "It is necessary to explain to the accountants and external auditors (E&Y), but it would be no problem by explaining that there was miscalculation at Secretariat."

93.     Sometime afterward, Ghosn's subordinates, including Kelly, took steps to have Nissan's finance department record the pension increase in Nissan's accounting systems, including by falsely informing Nissan's CFO that the increase was the result of a mistake at the Secretariat's Office.

94.     The additional retirement allowance was recorded in Nissan's accounting and finance records for fiscal year 2014.

95.     In early 2015, Nissan Employee 2 proposed a disclosure to Nissan's CFO and Kelly describing the increase as an "updated amount of retirement benefits for directors and statutory auditors."  The disclosure gave the misleading impression that the increase benefited multiple

directors and statutory auditors, when in fact the entire approximately $29 million increase only benefitted Ghosn.  Nissan's fiscal year 2014 annual report filed in June 2015 reflected that misleading disclosure, and did not disclose that only Ghosn's retirement benefits were substantially increased or that they were increased by roughly $29 million.

96.     Beginning in or around October 2014, Ghosn directed Nissan Employee 1 to include the value of Ghosn's pension allowance in U.S. dollars on the spreadsheets tracking the value of his undisclosed compensation and retirement allowance.  In doing so, Nissan Employee 1 used an exchange rate from 2012 that would provide Ghosn greater benefit than the prevailing exchange rate at the time of the conversion in 2014, which increased the value of Ghosn's pension allowance by $22 million.

97.     In or around February 2015, Ghosn, with the assistance of Nissan Employee 1, approved the incorrect recording of this additional $22 million in connection with the booking of the LTIP awards.  This was never disclosed by Nissan or Ghosn.

98.      Kelly knowingly or recklessly provided substantial assistance to Ghosn's efforts to increase his retirement allowance, including by discussing the plans with Ghosn and other Nissan employees, reviewing documents intended to effect the schemes, providing a false description of the change to Nissan's CFO, failing to correct the false and misleading disclosure regarding the change, and directing other Nissan employees in furtherance of the scheme.

### CLAIMS FOR RELIEF

### First Claim (Ghosn)

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and SEC Rule 10b-5 [17 C.F.R. § 240.10b-5]

99.     Paragraphs 1 through 98 are realleged and incorporated herein by reference.

100.    At all relevant times, Section 10(b) of the Exchange Act and SEC Rule 10b-5 made it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of

interstate commerce, or of the mails, or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons, in connection with the purchase or sale of any security.

101.    By reason of the foregoing, Ghosn violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder.

### Second Claim (Kelly)

**Aiding and Abetting Violations of Section 10(b) of the
Exchange Act [15 U.S.C. § 78j(b)] and SEC Rule 10b-5 [17 C.F.R. § 240.10b-5]**

102.    Paragraphs 1 through 98 are realleged and incorporated herein by reference.

103.    At all relevant times, Section 10(b) of the Exchange Act and SEC Rule 10b-5 made it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons, in connection with the purchase or sale of any security.

104.    Through the conduct described above, Ghosn and Nissan are liable for violating Section 10(b) of the Exchange Act and SEC Rule 10b-5.

105.    By reason of the conduct described above, Kelly, acting knowingly or recklessly, provided substantial assistance to Ghosn's and Nissan's violations of Section 10(b) of the

Exchange Act and SEC Rule 10b-5, and is therefore liable for aiding and abetting these violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### Third Claim (Ghosn)

**Aiding and Abetting Violations of Section 10(b) of the
Exchange Act [15 U.S.C. § 78j(b)] and SEC Rule 10b-5 [17 C.F.R. § 240.10b-5]**

106.    Paragraphs 1 through 98 are realleged and incorporated herein by reference.

108.    At all relevant times, Section 10(b) of the Exchange Act and SEC Rule 10b-5 made it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons, in connection with the purchase or sale of any security.

109.    Through the conduct described above, Nissan is liable as *respondeat superior* for violating Section 10(b) of the Exchange Act and SEC Rule 10b-5.

110.    By reason of the conduct described above, Ghosn, acting knowingly or recklessly, provided substantial assistance to Nissan for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, and is therefore liable for aiding and abetting these violations pursuant to Section 20(e) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a

Final Judgment:

A.       Permanently enjoining Ghosn and Kelly from violating, directly or indirectly,

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and SEC Rule 10b-5 [17 C.F.R. §

240.10b-5], and from aiding and abetting violations of these provisions;

B.       Prohibiting Ghosn and Kelly, pursuant to Section 21(d)(2) of the Exchange Act

[15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of

securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is

required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

C.       Imposing civil monetary penalties against Ghosn and Kelly pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

D.       Granting such other relief as this Court may deem just and appropriate.

Dated:  September 23, 2019

Respectfully submitted,

*/s/ John J. Bowers*

|  | John J. Bowers (SDNY # JB8515) |
|---|---|
|  | Assistant Chief Litigation Counsel |
|  | Christian D. H. Schultz |
|  | Assistant Chief Litigation Counsel |
|  | Timothy N. England |
|  | Assistant Director |
|  | William B. Ney |
|  | Senior Counsel |
|  | U.S. Securities and Exchange Commission |
|  | 100 F St., NE |
|  | Washington, D.C. 20549-4010 |
|  | (202) 551-4645 (Bowers) |
|  | bowersj@sec.gov |
|  | (202) 551-4740 (Schultz) |
|  | schultzc@sec.gov |